# United States Court of Appeals

## For the Eleventh Circuit

No. 00-15985

District Court Docket No.
00-01510-CV-ORL-28C-6

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Dec 6, 2000

THOMAS K. KAHN
CLERK

ROBERT C. TOUCHSTON,
DEBORAH SHEPPERD,  et al.,

Plaintiffs-Appellants,

versus

MICHAEL MCDERMOTT, in his official capacity as a member of the County Canvassing
Board of Volusia County,
ANN MCFALL, in her official capacity as a member of the County Canvassing Board of
Volusia County,

Defendants-Appellees.

-------------------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
-------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion, included herein by
reference, is entered as the judgment of this Court.

Entered:     December 6, 2000
For the Court:   Thomas K. Kahn, Clerk
By:     McCombs, Elaine

ISSUED AS MANDATE
JAN 1 9 2001
U.S. COURT OF APPEALS
ATLANTA, GA.

57

# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.

Atlanta, Georgia  30303

**Thomas K. Kahn**
Clerk

In Replying Give Number
Of Case And Names of Parties

January 19, 2001

Sheryl L. Loesch
Clerk, U.S. District Court
80 N. Hughey Ave, Floor 2-#218
Orlando  FL  32801

RE: 00-15985-GG      Robert C. Touchston v. Michael McDermott
DC DKT NO.:  00-01510 CV-ORL-28C-6

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original record on appeal or review, consisting of: three volumes.

Please acknowledge receipt on the enclosed copy of this letter.

A copy of this letter and the judgment form, <u>but not a copy of the court's opinion or Rule 36-1 decision,</u> is also being mailed to counsel and pro se parties. A copy of the court's opinion or Rule 36-1 decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Lisa Streeter (404) 335-6134

Encl.

MDT-1 (1-2001)

PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 00-15985

D.C. Docket No. 00-01510-CV-ORL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

DEC - 6 2000

THOMAS K. KAHN
CLERK

ROBERT C. TOUCHSTON,
DEBORAH SHEPPERD, ET AL.,

Plaintiffs-Appellants,

versus

MICHAEL MCDERMOTT, in his official capacity
as a member of the County Canvassing Board
of Volusia County,
ANN MCFALL, in her official capacity
as a member of the County Canvassing Board
of Volusia County, ET AL.,



Defendants-Appellees.

------------------------------
Appeal from the United States District Court for the
Middle District of Florida
------------------------------

**(December 6, 2000)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit
Judges.

PER CURIAM:

The district court's denial of a preliminary injunction is affirmed for the reasons set forth in <u>Siegel v. LePore</u>, No. 00-15981 (11th Cir. Dec. 6, 2000).

AFFIRMED.

TJOFLAT, Circuit Judge, dissenting, in which BIRCH and DUBINA, Circuit Judges, join, and in which CARNES, Circuit Judge, joins as to Part V.

Following the November 7, 2000 general election, the Florida Supreme Court handed down a decision in Palm Beach County Canvassing Bd. v. Harris, Nos. SC00-2346, SC00-2348, SC00-2349 (Fla. Nov. 21, 2000), vacated by Bush v. Palm Beach County Canvassing Bd., No. 00-836, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (December 4, 2000), that changed the standards for counting votes and certifying vote totals in the race for President and Vice President of the United States. Specifically, the supreme court gave its imprimatur to a scheme under which a political party could obtain a manual recount of votes in select counties. By changing the "rules of the game" after it was played, the supreme court debased the votes of thousands of Florida voters and denied them the equal protection of the laws guaranteed by the Fourteenth Amendment.

In this case, brought by voters of Brevard County, Florida, a United States district judge refused to enter a preliminary injunction enjoining the manual counting of votes in four counties selected by the Florida Democratic Party. The voters appealed. Now, three weeks later, this court affirms the district judge's ruling.

Plaintiffs may return to the district court tomorrow and ask for a ruling on the merits of their claims. If they do so and the district court rules, which is likely given

the obvious need for immediate and decisive action, the case will return to this court and the decision that some are reluctant to make today will have to be made.

I dissent because, in my view, plaintiffs have established a case of serious constitutional deprivation. Contrary to the majority's view that the record needs further factual development, the pertinent facts are well known and uncontested. "We cannot as judges be ignorant of that which is common knowledge to all men." Sherrer v. Sherrer, 334 U.S. 343, 366, 68 S. Ct. 1087, 1102, 92 L. Ed. 1429 (1948). The "man on the street" is well aware of the mischief the Florida Supreme Court's Harris decision has wrought.  As I explain below, further proceedings in the district court are unnecessary.  Plaintiffs' constitutional injuries are real; they increase in magnitude daily.  We should delay no further.

## I.

### A.

#### 1.

The outcome of the national presidential election, conducted November 7, 2000, turns upon the results in Florida, for neither the Republican ticket of Governor George W. Bush and his running-mate Secretary Dick Cheney nor the Democratic ticket of Vice President Al Gore and his running-mate Senator Joseph Lieberman has enough

electoral votes to win the election without the twenty-five electoral votes from Florida.[1] The outcome of the Florida election has been hotly contested because the results are so close.

The initial count of the November 7 vote, as reported by the Division of Elections of the State of Florida, revealed that the votes for the Republican ticket totaled 2,909,135 and that the votes for the Democratic ticket totaled 2,907,351.[2] Other candidates on the presidential ballot received a combined total of 133,583 votes. The margin of difference between the Republican and Democratic tickets was 1784 votes, or 0.0299% of the total votes cast in Florida.

Florida law requires an automatic recount in all races where, as here, the final differential between two candidates is 0.5% or less.  Fla. Stat. § 102.141(4).  This recount was conducted in all 67 Florida counties beginning on November 8, 2000;

---

[1] A candidate must receive a majority of those electors entitled to vote.  U.S. Const., Art. II, § 1 ("The Person having the greatest Number of Votes [of electors] shall be the President, if such Number be a Majority of the whole Number of Electors appointed.").  Assuming all of the electors vote in this presidential election, a candidate will need at least 270 electoral votes to win the election.  Without Florida's 25 electoral votes, the Democratic ticket has 255 electors pledged to vote for its ticket and the Republican ticket has 246 electors.

Although the results are not final in New Mexico and Oregon, the number of electors in these two states is insufficient to give either the candidate the election – even if one candidate wins both states.  New Mexico has five electoral votes; Oregon has seven electoral votes.

[2] These numbers did not include vote totals received from overseas. Florida law permits its residents who are currently located overseas to have their ballots counted if the ballots arrive in Florida within ten days of the date of election provided the ballot is either "postmarked or signed and dated" no later than the date of election.  Fl. Admin. Code Ann. r. 1S-2.013(2), (7).

certifications to the Department of State were completed by November 14.[3] The results of this automatic recount altered the margin between the Republican ticket and the Democratic ticket.  The difference between the parties after the automatic recount (but still before the overseas absentee votes were counted) was a mere 300 votes; the Republican ticket received 2,910,492 votes and the Democratic ticket received 2,910,192 votes.

On November 18, the overseas absentee ballots were counted and certified to the Department of State by the counties.  The inclusion of these ballots increased the lead for the Republican ticket to 930 votes.[4]  Finally, following an order by the Florida Supreme Court on November 21,[5] all manual recounts that were completed and submitted to the Elections Canvassing Commission[6] by 5:00 P.M. on November 26

---

[3] Volusia County finished a manual recount in time to submit its totals to the Secretary of State before the deadline on November 14.  Thus, the November 14 vote totals included manually recounted ballots from Volusia County.

[4] The Republican ticket received 2,911,872 votes and the Democratic ticket received 2,910,942.

[5] I recognize that the United States Supreme Court has subsequently vacated the decision of the Florida Supreme Court and remanded the case for further proceedings.  See Bush v. Palm Beach County Canvassing Bd., No. 00-836, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (December 4, 2000).  It is unclear what effect the decision of the United States Supreme Court has on the certification of votes.  However, as discussed infra II, I believe that the Florida Supreme Court's initial decision provides solid evidence of the manner in which Florida's statutory election system operates.

[6] The Elections Canvassing Commission consists of the Governor, the Secretary of State, and the Director of the Division of Elections.  Fla. Stat. § 102.111(1).  In the current dispute over the presidential election, the Governor of Florida, Jeb Bush, has recused himself from the

6

were added to final vote totals.  The evening of November 26, the Elections Canvassing Commission certified the vote total of Florida in the presidential race.  That certification stated that Governor Bush received 2,912,790 votes and Vice President Gore received 2,912,253 votes – a difference of 537 votes.[7]

## 2.

The Florida statutory election system contemplates mixed control between local and state officials.  The Secretary of State is the chief election officer of the state, Fla. Stat. § 97.012(1), but the actual conducting of elections takes place in each of the various counties of Florida under the auspices of the county supervisor of elections.[8]

---

Elections Canvassing Commission because the Republican candidate for President, George W. Bush, is the brother of the Florida Governor.  The Florida Governor has appointed the Agriculture Commissioner, Bob Crawford, as his replacement on the State Elections Canvassing Commission.

[7] Palm Beach County did not complete its recount by the 5:00 deadline, so the Secretary of State did not include in the final certification any of the votes gained in that county's manual recount.  Further, Miami-Dade County determined that it could not complete its manual recount by the 5:00 deadline, so the November 26 certified vote total does not include ballots added by a manual recount in that county.  Broward County completed its manual recount by the deadline.  Thus, the November 26 vote certification included manual recounts from Broward County and from Volusia County (as noted supra note 3).

The November 26 certified vote total also included 288 overseas absentee votes that were not included in the November 18 certification.  Of these 288 votes, 195 went to Governor Bush, 86 went to Vice President Gore, and 7 went to other candidates.

[8] The county supervisor of elections is an elected official with a four-year term, according to statute.  Fla. Stat. § 98.015(1).  Each county supervisor employs deputy supervisors.  Fla. Stat. § 98.015(8).  Additionally, each county has a canvassing board, which typically consists of the supervisor of elections, a county court judge, and the chair of the board of county commissioners.

County canvassing boards are responsible for counting the votes given to each candidate, Fla. Stat. § 102.141, and they may, sua sponte, order mechanical recounts "[i]f there is a discrepancy which could affect the outcome of an election." Fla. Stat. § 102.166(3)(c). After the county canvassing board certifies the votes, the county results in any race involving a state or federal office are forwarded to the Department of State.[9] Fla. Stat. § 102.111(1); Fla. Stat. § 102.112. After all the counties have certified election returns to the Department of State, the Elections Canvassing Commission has the power to "certify the returns of the election and determine and declare who has been elected for each office." Fla. Stat. § 102.111(1).

Florida Statute section 102.166(4)(a)-(b) authorizes a candidate or his political party – but not a voter – to request a county canvassing board to conduct a "manual recount," provided that the request is made "prior to the time the canvassing board certifies the [election] results . . . or within 72 hours after midnight of the date the

---

Fla. Stat. § 102.141(1).

[9] County canvassing boards are required to file a report on the "conduct of the election" with the Division of Elections at the same time that the results of an election are certified to the Department of State.

> The report shall contain information relating to any problems incurred as a result of equipment malfunctions either at the precinct level or at a counting location, any difficulties or unusual circumstances encountered by an election board or the canvassing board, and any other additional information which the canvassing board feels should be made a part of the official election record.

Fla. Stat.§ 102.141(6).

8

election was held, whichever occurs later."  When presented with a manual recount request, the canvassing board has unrestricted discretion to grant or deny a sample manual recount of three precincts. Fla. Stat. § 102.166(4)(c)-(d); see Broward County Canvassing Bd. v. Hogan, 607 So.2d 508, 510 (Fla. 4th DCA 1992) ("The statute clearly leaves the decision whether or not to hold a manual recount of the votes as a matter to be decided within the discretion of the canvassing board.").  If the board so authorizes, the candidate chooses the three precincts to sample.  Then:

> If the manual recount [of the three precincts] indicates an error in the vote tabulation which could affect the outcome of the election, the county canvassing board shall:
> (a) Correct the error and recount the remaining precincts with the vote tabulation system;
> (b) Request the Department of State to verify the tabulation software; or
> (c) Manually recount all ballots.

Fl. Stat. § 102.166(5).

### 3.

Unsatisfied with the results of the initial vote count, the Florida Democratic Party, pursuant to Fla. Stat. § 102.166(4)(a), requested manual recounts in four selected counties: Broward, Miami-Dade, Palm Beach, and Volusia.  These requests were made on November 9.  Voter registration in these four counties is heavily Democratic, and the Democratic ticket carried them by a substantial margin in both the initial vote

counts and automatic recounts.  No candidate or political party requested manual recounts of the presidential race in any of the other sixty-three counties.  The decisions of the county canvassing boards to conduct full manual recounts in the four counties requested by candidate or political parties pursuant give rise to this lawsuit and other litigation concerning the Presidential election in Florida.

## B.

### 1.

On November 13, 2000, Robert C. Touchston, Deborah Shepperd, and Diana L. Touchston commenced this action by filing a verified complaint and moving for a preliminary injunction in the District Court for the Middle District of Florida.  Plaintiffs are registered voters in Brevard County, Florida, who voted in the general election on November 7; they attempted to cast their ballots for the Republican ticket of George W. Bush and Dick Cheney for President and Vice-President of the United States.[10] Plaintiffs sued the Florida Secretary of State, members of the Elections Canvassing

---

[10] We note that plaintiffs "attempted" to cast their ballots because, as explained infra, it is impossible for a voter to know whether his or her vote was properly cast and duly tabulated. Plaintiffs allege that they voted for the Republican ticket, but it is conceivable that plaintiffs actually did no more than attempt to vote for the Republican ticket due to, among other possibilities, stray marks on the voting ballot.

Commission, and the county canvassing boards of Volusia, Palm Beach, Broward, and Miami-Dade Counties.[11]

Plaintiffs brought this action pursuant to 28 U.S.C. § 1983, claiming violations of the Fourteenth Amendment. Section 1983 provides a remedy for the deprivation of rights "secured by the Constitution and laws" of the United States by persons acting under color of state law. In their complaint, plaintiffs allege that the manual recounting of ballots in some counties but not others unconstitutionally debases the votes cast in the latter counties, and in particular the votes cast by plaintiffs and those similarly situated. Plaintiffs also allege that the lack of standards to guide the canvassing boards in determining "the voter's intent," Fla. Stat. § 102.166(7)(b), in a manual recount unconstitutionally debases votes by permitting the canvassing boards to speculate as to a voter's intent and thereby erroneously conclude that a voter cast a ballot in behalf of a particular candidate. Plaintiffs seek a judicial declaration that Fla. Stat. § 102.166(4) is unconstitutional (both on its face and as applied) because it debases their votes and the votes of those similarly situated and thereby denies them rights guaranteed by the Fourteenth Amendment.

_____

[11] After the complaint was filed, Governor Bush moved the district court for leave to intervene as a defendant. The district court granted his motion on November 16. After this appeal was taken, the Florida Democratic Party moved this court to intervene on November 15. We granted the motion on November 29. The Attorney General of Florida moved this court to intervene on December 1. We granted the motion.

Plaintiffs therefore asked the district court to enjoin the county defendants from "certifying any vote tallies that include the results of any manual recount" in Broward, Miami-Dade, Palm Beach, and Volusia Counties; to enjoin the state defendants from "receiving" and thereafter "certifying the results of the election for electors" for the office president and vice-president based, in whole or in part, on the results of any manual recount; and to order the state defendants to certify the results of the election on November 17, 2000, based on county-certified results that did not include any manual recounts.[12]

On appeal, this court ordered that the case be heard initially <u>en banc</u>, pursuant to Fed. R. App. Proc. 35. <u>See</u> <u>Hunter v. United States</u>, 101 F.3d 1565, 1568 (11th Cir. 1996) (en banc); <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc). Plaintiffs asked this court for an injunction pending appeal, which, if granted, would have enjoined the county defendants from conducting manual recounts and/or enjoined the state defendants from certifying the results of the Presidential election that

---

[12] On filing their verified complaint, plaintiffs moved the district court to enter a preliminary injunction granting the above relief. On November 14, after hearing argument from counsel, the district court denied plaintiffs' motion. <u>Touchston v. McDermott</u>, ___ F. Supp. 2d ___, No. 00-01510-CV (M.D. Fla. slip op., Nov. 14, 2000). When the hearing began, the district court announced that it would rule on plaintiffs' motion without entertaining any evidence. The district court also denied plaintiffs' oral motion for an injunction pending appeal. After these denials, plaintiffs filed a notice of appeal with this court on November 14.

contained any manual recounts. We denied the motion without prejudice. <u>Touchston v. McDermott</u>, ___ F.3d ___, No. 00-15985 (11th Cir. slip op., Nov. 17, 2000).

## 2.

Plaintiffs appeal from the district court's order denying a preliminary injunction. While this appeal has been pending, several things have transpired which have materially altered the status of the case.

First, the Florida Supreme Court, in consolidated cases in which the plaintiffs in the case before us were not parties, has interpreted Florida's statutory election system to permit selective manual recounting in counties chosen by a candidate or his political party. <u>Palm Beach County Canvassing Bd. v. Harris</u>, Nos. SC00-2346, SC00-2348, & SC00-2349 (Fla. Nov. 21, 2000), <u>vacated by</u> <u>Bush v. Palm Beach County Canvassing Bd.</u>, No. 00-836, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (Dec. 4, 2000). In effect, the Florida Supreme Court removed any doubt that may have existed as to whether Florida's vote counting scheme operates as the plaintiffs allege in their verified complaint. Given the court's ruling, plaintiffs' constitutional claims now present pure questions of law.[13]

---

[13] The fact that the United States Supreme Court vacated and remanded the decision of the Florida Supreme Court is of no moment. The Florida Supreme Court's interpretation of Florida's statutory scheme was not questioned by the United States Supreme Court. <u>Bush v.</u>

Second, a series of events has highlighted the current and future constitutional injury to the plaintiffs and those similarly situated. Already, Volusia County and Broward County have included the results of manual recounts of ballots, based on requests by the Florida Democratic Party, in the November 26 official certification by the Elections Canvassing Commission. These manual recounts proceeded under the standardless vote counting scheme at issue and thus necessarily included some "votes" that were not detected by the vote tabulating machines but were counted because county elections officials determined the "intent" by examining the ballot.[14] Plaintiffs languish under the very real possibility of further injury because of the "contest" suit brought by Vice President Gore in Leon County pursuant to Fla. Stat. § 102.168. Gore v. Harris, No. CV-00-2808 (Fla. Cir. Ct. Nov. 27, 2000). In that litigation, Gore claims that legal votes (which his complaint calls "indentations" in punch card ballots) have not been counted in Miami-Dade and Palm Beach counties. The lawsuit seeks a

---

Palm Beach County Canvassing Bd., No. 00-836, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (Dec. 4, 2000). Instead, the United States Supreme Court vacated the Florida Supreme Court's judgment because it was unsure whether the judgment was based solely on issues of state law. Because of this ambiguity, the United States Supreme Court simply requested the Florida Supreme Court to clarify the underlying rationale for their interpretation – not to clarify their interpretation itself. Id. That the judgment was vacated does not alter the fact that the election for president in Florida has been conducted pursuant to the Florida Supreme Court's decision in Harris.

[14] Volusia County produced 98 net additional votes for Vice President Gore. Broward County produced 567 net additional votes for Vice President Gore.

judicially-mandated manual recount of ballots in these counties and asks that new totals, which would include indented ballots, be added to the certified total. Although the trial court ruled against the need for further recounts, an appeal has already been taken and the matter is pending with the Florida Supreme Court. Gore v. Harris, No. SC00-2431 (Fla.) (filed Dec. 5, 2000). Thus, the potential for further injury to the plaintiffs and those similarly situated is very real.

In light of these events and the fact that this appeal presents pure questions of law, plaintiffs have moved this court to consider the merits of their claims and to direct the entry of an injunction.

In the ensuing analysis, the question arises whether the Florida Supreme Court's decision in Harris announced a new vote counting scheme for statewide elections in Florida or whether it merely interpreted the pre-existing vote counting model. Either answer to this question presents a pure question of constitutional law. In Part III, I address the question from the starting point that the Florida Supreme Court announced a new vote counting model for Florida. In Part IV, I address the question from the other starting point – that the Florida Supreme Court merely clarified the pre-existing vote counting model. Before I embark on the analysis, however, I discuss the competing "models" that have been presented as properly implementing Florida's

15

statutory election system is appropriate and instructive.   Part II undertakes this discussion.

II.

In Palm Beach County Canvassing Board v. Harris, Nos. SC00-2346, SC00-2348, SC00-2349 (Fla. Nov. 21, 2000), vacated by Bush v. Palm Beach County Canvassing Bd., No. 00-836, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___ (Dec. 4, 2000), the Florida Supreme Court was faced with conflicting interpretations of the state's election statutes.  The Florida Secretary of State, as appellee before the supreme court, interpreted the statutes as having created one vote counting model, and the Florida Attorney General, as intervenor-appellant, interpreted the statutes as embodying a different model.  In Harris, the court rejected the Secretary of State's interpretation in favor of the interpretation advocated by the Attorney General.

In order to understand the court's decision in Harris, one must consider two things.  First, one has to understand how Florida voters cast their ballots in a general election, including the one held on November 7.  Second, one must compare the model for counting votes advocated by the Secretary of State with the model that emerged from the Florida Supreme Court's opinion.

16

## A.

In the November 7 election, voters in 65 Florida counties cast their votes on paper ballots read by vote tabulating machines.[15]  For ease of discussion, I describe the voting process as it occurs in counties that use punch card ballots.[16]  A voter can return a punch card ballot in one of three conditions: (1) the voter may take a ballot but choose not to vote in any election or referendum, so that the ballot contains no punched holes when returned; (2) the voter may vote in some but not all contests, so that the ballot contains punched holes in some races when returned; or (3) the voter may vote in all contests, so that the ballot is returned with a hole punched for every race.  If a

_____

[15] Of the remaining two counties, one county uses mechanical lever voting machines and one county counts all votes by hand.  Mechanical lever voting machines record votes on a counter wheel when voters pull a lever after making their voting choices, but no paper is produced.

[16] Twenty-four counties use punch card voting systems.  A punch card ballot is a paper card bearing perforated punching holes that the voter inserts into a jig labeled with the candidates' names.  When properly inserted into the jig, the perforated punching holes on the card are aligned with holes in the jig next to the candidates' names.  To vote, the voter pushes a blunt-tipped stylus through the hole in the jig next to the desired candidate's name, punching out the small, perforated bit of the card (the "chad") that is aligned with the hole in the jig.  Once a voter has voted in all of the races for which he cares to vote, he deposits the ballot into the ballot box.

Forty-one counties use marksense voting systems.  In counties that use marksense technology, voters record their votes by using a pen or pencil to fill in geometric figures (circles, ovals, squares, or rectangles) next to the candidates or issues for which they wish to vote.  Marksense vote tabulating machines use optical scanning technology to detect the darkened figures and count the votes accordingly.

I recognize that Brevard County, the county in which all of the plaintiffs before us reside, uses the marksense technology in its vote tabulating machines.  Nevertheless, the same difficulties that arise in the marking and counting of votes on punch card ballots and equipment also arise with the marksense ballots and equipment.

voter returns the ballot with holes punched in some contests but not others, the ballot is said to be "undervoted."[17]

To count the votes, the ballots are fed into a punch card reading machine (the "vote tabulating machine") programmed to tabulate votes based on the location of holes punched. This machine count is conducted in every election, and, in most elections, is the only count. Recognizing that machines are not infallible, however, the Florida legislature created a failsafe manual recount provision that permits a candidate or political party to request a manual recount to verify the machine tabulation.[18] While the

---

[17] Some voters also return "overvoted" ballots which have multiple votes cast in a single contest where only one vote is appropriate.

[18] The Florida statutory election system provides for both an automatic recount of votes in certain close races and for candidate and voter protest of the election returns. Neither of these provisions, however, affects the baseline system. The automatic recount provision requires a recount of all votes in a race decided after the first count by one-half of one percent or less. Fla. Stat. § 102.141(4). Since this recount is a non-discretionary repeat of the initial count, I deem it to be nothing more than a re-do of the first machine count. The protest provision found in section 102.166(1)-(2) permits any candidate or voter to file a protest with the appropriate canvassing board, but does not provide any process or remedy for such a protest. Therefore this protest provision is, in my view, essentially meaningless.

Further, after the last county canvassing board has certified its election results, an unsuccessful candidate, an elector qualified to vote in the election, or any taxpayer may bring a judicial contest of the election. Fla. Stat. § 102.168. The contest complaint must be filed within ten days after the last county canvassing board certifies the results of the election being contested, Fla. Stat. § 102.168(2), and must set forth the grounds on which the contest is made, Fla. Stat. § 102.168(3). Section 102.168(3)(c) establishes that a valid ground for contesting an election includes, "[r]eceipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." As a remedy, the circuit judge is permitted to "fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, . . . to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances." Fla Stat. § 102.168(8).

18

process for counting votes is fixed by statute, there is room for interpretation in its implementation. Perhaps the most important part of the statutory system left open to interpretation is what constitutes a valid vote. The Florida Supreme Court noted in Harris that the ultimate goal in conducting an election is "to reach the result that reflects the will of the voters." Harris, at 9. The election statutes, however, do not provide guidelines outlining how the will of individual voters should be determined from their ballots. It is this lack of guidance that gave rise to the differing interpretations propounded by the Secretary of State and the Attorney General. According to the Secretary, a voter's will is only adequately expressed by properly casting a vote such that the machine can read it. Under the Attorney General's interpretation, with which the supreme court agreed, a vote is valid if it demonstrates the voter's intent in any ascertainable manner, whether read by the machine or not. To understand the model that emerged from Harris, one must first examine the model as understood by the Secretary of State.

**B.**

**1.**

The Secretary's vote counting model, which was in place prior to the supreme court's decision, applied a fixed, objective standard for determining voter intent –

19

voters were required to indicate their voting intent unequivocally by marking their ballots in such a way that the vote tabulating machine, with its pre-programmed evaluation standard, could read it. I refer to this vote counting model as the "machine model," because it counts as valid only those votes that the vote tabulating machine can read and record. The machine model thus relies on an objective tabulating machine that admits of no discretion to count votes – if a vote is properly cast according to the instructions given to the voter,[19] the machine will count it.[20]

Under the machine model, the purpose of the manual recount provision (the failsafe in the statutory election system) is to allow a candidate or his party to request human verification that the vote tabulating machine functioned properly. This construction of the manual recount provision explains why a canvassing board is given

---

[19] Instructions to voters in Palm Beach County, a county that uses punch card technology, read: "After voting, check your ballot card to be sure your voting sections are clearly and cleanly punched and there are no chips left hanging on the back of the card." The instructions in Broward County, also a punch card county, read: "To vote, hold the stylus vertically. Punch the stylus straight down through the ballot card for the candidates or issues of your choice."

[20] The Florida statutory election system includes a provision for the counting of properly cast votes that are not detected by the vote tabulating machine. If the vote tabulating machine does not record a properly cast vote for one or more contests on the ballot because the ballot was damaged or defective, Florida law requires that vote to be counted and added to the machine tabulation of votes. Fla. Stat. § 101.5614(5). If improperly marked ballots (such as punch cards bearing indented, but not detached, chads) are regarded as damaged or defective, then the initial ballot count in each county would not be complete until every ballot the tabulating machine reads as undervoted (including ballots read as totally blank) was counted in accordance with section 101.5614(5). The canvassing boards do not treat improperly marked ballots as damaged or defective when they perform their initial machine counts; they rely exclusively on the machine tabulation of votes.

three alternatives in section 102.166(5) in the event that it grants a manual recount request and the three-precinct sample manual recount reveals "an error in the vote tabulation."[21] The first two options permitted under section 102.166(5) do not require a complete manual recount of votes county-wide, but rather involve making repairs to the machine tabulating system so that it properly counts the votes. Only the third option available to the canvassing board permits a county-wide manual recount of ballots. The availability of these alternative solutions to correct an error in vote tabulation suggests that a full manual recount is appropriate only when the machine tabulating system has failed irreparably.

The Secretary of State, pursuant to her authority under section 97.012(1), interpreted the statutory system as the machine model. Nevertheless, the Florida Supreme Court, in its November 21 decision, rejected the machine model and, in effect, propounded a different model requiring a fluid, subjective test for ascertaining voter intent when counting votes.

## 2.

The Florida Supreme Court ruled that a ballot marked improperly, so that a vote tabulating machine reads it as undervoted, must nevertheless be examined for any

---

[21] I describe these three statutory alternatives in supra Part I.A.2.

evidence of voter intent that might be construed as a vote.[22]  This conflicts with the

Secretary of State's position that voter intent is sufficiently discerned by properly

functioning vote counting machines.[23]  According to the supreme court, ballots must be

inspected by hand because vote tabulating machines do <u>not</u> sufficiently read voter

intent.[24]  The vote counting model that emerged from the supreme court's decision

requires the counting of votes improperly cast (according to the Secretary's model) as

valid votes if, applying a subjective standard, voter intent can be ascertained by manual

inspection of the ballot.

While the court endorsed counting votes by looking at each race on a ballot to

determine whether the voter intended to cast a vote in that race, the court did not

provide uniform standards for counties to follow in determining voter intent.[25]  The

---

[22] The Florida Supreme Court stated that "'error in the vote tabulation' includes errors in the failure of the voting machinery to read a ballot and not simply errors resulting from the voting machinery." <u>Harris,</u> at 13.

[23] The Florida Supreme Court acknowledged that it was discarding the machine model supported by the Division of Elections, ruling that: "Although error cannot be completely eliminated in any tabulation of the ballots, our society has not yet gone so far as to place blind faith in machines. . . . Thus, we find that the Division [of Election's] opinion . . . is contrary to the plain language of the statute." <u>Id.</u> at 14.

[24] The Court concluded that there has been a vote tabulation error if there is "a discrepancy between the number of votes determined by a voter tabulation system and the number of voters determined by a manual count." <u>Id.</u> at 13.

[25] For example, the court did not require that the canvassing boards consider such circumstantial evidence as the instructions to the voter, or the physical appearance of the remainder of the ballot (including whether the voter clearly marked his choices for candidates in other races).

court left to each county canvassing board that conducts a manual recount the unfettered discretion to set its own standards. Under this standardless system, a mark on a punch card ballot that is deemed a sufficient showing of intent to be counted as a vote in one county might be deemed a non-vote by another county.[26]

Furthermore, although the court held that vote tabulating machines do not necessarily discern valid expressions of voter intent, it did not order that all 65 counties that use such machines begin manually examining all undervoted[27] ballots for any sign of voter intent. Rather, the court left the candidates or their parties with the option of requesting a count of undervoted ballots by invoking the manual recount statute in any one or more counties.

Accordingly, applying <u>Harris</u> to my punch card example, indentations on punch card ballots – which I call "dimple votes" – may be counted as valid votes in selected

---

[26] For instance, Florida Circuit Court Judge Jorge LaBarga, in a Declaratory Order, stated that:

> [T]he Palm Beach Canvassing Commission has the discretion to utilize whatever methodology it deems proper to determine the true intention of the voter and it should not be restricted in the task. To that end, the present policy of a per se exclusion of any ballot that does not have a partially punched or hanging chad, is not in compliance with the law.

<u>Florida Democratic Party v. Palm Beach County Canvassing Bd.</u>.

[27] I recognize the ballots rejected the tabulating machines as overvoted may also be deemed to contain valid expressions of voter intent on manual inspection. While I restrict my explication of the vote counting model that emerged from <u>Harris</u> to undervoted ballots, the model, and the concern it raises, are equally applicable to the attribution of valid voter intent to overvoted ballots.

counties.[28]  The necessary implication of this model, given that the machines are not programmed to count dimples, is that a vote tabulating machine is merely a <u>screening device</u> – a method of determining the intent of voters who properly punched their ballots – that is inadequate as a tabulating device because it fails to count all valid votes.

If the vote tabulating machines serve merely as a screening device in counting valid votes, then the legislature, in enacting sections 102.166(4)-(7), inaptly refers to the process of manually counting dimple votes as a "recount." In fact, a county's <u>initial</u> vote count (including the automatic recount) is not complete until all ballots containing non-votes in any race have been examined manually. Nevertheless, section 102.166(4) provides that such a manual examination of ballots will be conducted only at a candidate or political party's request, and only in those specific counties chosen by the candidate or political party.[29]  In other words, while <u>Harris</u> presumes that vote tabulating machines will not count all valid votes, it precludes the counting of remaining votes except in those counties selected by a candidate or his party.  Under this

---

[28] In saying "dimple votes," I am referring to any mark on either a punch card or marksense ballot that was not made according to the directions for casting a proper vote.  Such improper markings are not read by the vote tabulating machines, but may be construed by some people as giving insight into the voter's intent upon manual inspection.

[29] Fl. Stat. § 102.166(4) ("Any candidate whose name appeared on the ballot [or his political party] . . . may file a written request with the county canvassing board for a manual recount.").

"selective dimple model,"[30] dimple votes cast in a county where no "recount" is requested are simply not counted.

Under the selective dimple model, the standard of evaluating voter intent (i.e., what constitutes a valid vote) in a manual recount will differ from the standard applied by the machines in the initial count. The model, therefore, lends itself to several undesirable results.[31]

Since the selective dimple model leaves to the candidates the decision of whether and where dimple votes should be included in the final vote tally, the system encourages candidates to cherry-pick – to carefully select the counties in which to request that ballots be manually examined for dimple votes. Under the selective dimple model, a candidate will choose the counties based on: (1) the percentage of the total machine-tabulated vote received; (2) the size of the county, measured by the total number of ballots cast in the election; and (3) the political makeup of the canvassing board in the county.[32] A candidate will want dimple votes counted in counties where

---

[30] I refer to the vote counting model that emerged from the Florida Supreme Court's decision in Harris as the selective dimple model because the model contemplates that dimple votes will be counted only in those counties selected by a candidate or his political party for a manual recount.

[31] The undesirable implications of the selective dimple model, discussed in infra Part IV, apply only in statewide or multi-county elections.

[32] In most Florida counties, all members of the canvassing board will be elected officials.

25

he captured a greater proportion of the machine tabulated vote than did his opponent, because the candidate can expect that he will likely take a similar proportion of the dimple votes.[33]  A candidate will favor counties where the most ballots were cast because those counties will have the most dimple votes.[34]  The political composition of the county canvassing board will be critical to a candidate in making selective manual count requests for two reasons.  First, the election statutes give the canvassing board unfettered discretion to honor a candidate's request to manually examine ballots.[35]  Second, if the canvassing board grants the request, the election system affords the canvassing board unfettered discretion to set the standards for determining which markings on a ballot demonstrate voter intent sufficient to constitute a vote.[36]

---

[33] In reality, the candidate will probably receive a higher proportion of the vote in a manual count because the county canvassing board has unfettered discretion as to what constitutes sufficient voter intent to amount to a vote.  Since candidates are most likely to request and be granted manual recounts in counties where the canvassing board is dominated by political allies, the canvassing board will likely lean, when intent is difficult to discern, to finding a voter intended to vote for the candidate who requested the count.

[34] For example, assume that five percent of voters statewide cast dimple votes.  In a county where 1,000 ballots were cast, a candidate will likely have only 50 ballots from which he can hope to pick up votes if he requests that dimple votes be counted.  In a county where 10,000 total ballots were cast, a candidate will likely have 500 ballots from which he can hope to pick up additional votes by requesting that dimple votes be counted.

[35] Fla. Stat. § 102.166(4)(c) (providing no standards for determining whether a candidate's request for a manual recount should be granted, but rather stating simply that "[t]he county canvassing board may authorize a manual recount").

[36] Section 102.166(7) describes the procedures to be followed in the conduct of a "manual recount" of ballots and provides simply that the canvassing board's objective in evaluating ballots is "to determine the voter's intent." Fla. Stat. § 102.166(7)(b).  Evidence of intent that a

Thus, a candidate is more likely to have his request for a manual count granted, and to receive favorable interpretations of voter intent, in counties where the candidate shares a political party affiliation with the majority of the canvassing board.

As discussed above, section 102.166(5) allows the county canvassing board to conduct a recount[37] only if the results of the recount "could affect the outcome of the election." Seemingly, the candidate who received the most votes state-wide according to the machine tabulation could never demonstrate that a manual recount of any county could affect the outcome of the election,[38] since adding dimple votes would only serve to increase that candidate's margin of victory. Thus, it is doubtful that a county canvassing board would, in its discretion, grant such a candidate's request for the sample manual recount. Arguably, however, granting the candidate's request could affect the outcome of the election if his opponent is granted full recounts in other counties, and thereby gains a significant number of votes. Given that the canvassing board has limited time to certify the election results, and that one board may not know

---

canvassing board might consider in deciding whether an indentation is a vote includes the instructions given to voters on how to properly cast a vote, examination of how the voter marked the ballot in other races, and whether the other votes cast on the ballot indicate an attempt to vote party line.

[37] The board has three options in the case of an "error in the vote tabulation," including a county-wide manual recount, as discussed supra Part I.A.2.

[38] Unless, of course, the candidate chose a densely populated county in which he carried a vast minority of the machine-counted vote – a highly unlikely strategy.

whether another county will manually recount its ballots, I question exactly what remains to guide a canvassing board in its decision to grant or deny a manual count.

The selective dimple model also encourages candidates to manipulate the timing of manual recount requests, so as to use the statutory limitations period to foreclose his opponent from making his own requests for manual counts. Since the manual recount statute cuts off a candidate's right to request a manual examination of ballots, a candidate who stays his request until the midnight hour may pin his opponent against the statutory deadline.[39] Thus, by gaming the timing and location of recount requests under the selective dimple model, a candidate can maximize the count of dimple votes cast for him, while minimizing the number of dimple votes counted for his opponent.

## C.

Prior to the supreme court's decision in Harris, the Division of Elections interpreted the statutory election system as creating a machine model. The decision, however, indicated that the selective dimple model is the proper vote counting scheme

---

[39] Implicit in the selective dimple model is the propensity for candidate gaming – treating some voters like pawns in a chess match. Each candidate will try to maximize the number of dimple votes counted for him, while minimizing the number of dimple votes gained by his opponent. To that end, a candidate will gladly sacrifice the dimple votes of supporters who cast those votes in counties that the machine tabulation indicates were carried by his opponent. Those dimple votes, and the voters who cast them, are the pawns – they are throwaways – that the candidate will sacrifice to advance his effort to have dimple votes counted only in select, favorable counties where he stands to achieve a net gain if dimple votes are counted.

under the statutory election system.  In Part III, therefore, I discuss whether the supreme court's decision constituted a post-election change in Florida's vote counting model, in derogation of the principles set forth in Roe v. Alabama, 68 F.3d 404 (11th Cir. 1995) ("Roe III").  In Part IV, I consider whether the selective dimple model that emerged from Harris infringes upon plaintiffs' rights in violation of the Fourteenth Amendment.

## III.

Plaintiffs contend that Harris materially altered Florida's vote counting model after the November 7 election.  They argue that retroactively validating defective votes by judicial decree violates the rule established in Roe.

While federal courts generally do not intervene in "garden variety election disputes," our involvement is appropriate and necessary when "the election process itself reaches the point of patent and fundamental unfairness" indicating a violation of due process for which relief under 42 U.S.C. § 1983 is appropriate.  Curry v. Baker, 802 F.2d 1302, 1315 (11th Cir. 1986) (internal citations omitted).  The Supreme Court has held that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise

of the franchise." Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 1378, 12 L. Ed. 2d. 506 (1964).

In Roe, we were presented with allegations that a post-election judicial interpretation of a state's election laws required the inclusion of theretofore invalid votes, which amounted to stuffing the ballot box. See Roe I, 43 F.3d at 581. An Alabama statute required a person voting by absentee ballot to execute an affidavit in the presence of a "notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older." Id. at 577, citing Ala. Code § 17-10-7 (1980). During a general election held on November 8, 1994, "[b]etween 1000 and 2000 absentee voters failed to properly complete their affidavits, either by failing to have their signatures notarized or by failing to have them witnessed by two people." Id. at 578. Pursuant to the applicable statute, those ballots were not counted – but were set aside as contested ballots. The election results in one race were particularly close – informal estimates placed the leading candidates "a mere 200 to 300 votes apart without counting the contested absentee ballots." Id. Two absentee voters, on behalf of themselves and others similarly situated, filed suit in state court seeking an order that the contested absentee ballots be counted. The court ordered that certain of the absentee ballots be counted, stating that "[a]bsentee ballots may not be excluded from being counted because of a lack of notarization or a lack of witnesses." Id. (emphasis

in original).  The court further ordered that the Secretary of State refrain from certifying the vote totals until the new count, including the contested absentee ballots, was forwarded to him.  Id.

Larry Roe, on behalf of himself and other similarly situated Alabama voters, brought suit in the United States District Court for the Southern District of Alabama alleging that the counting of absentee ballots, in contravention of the state's past practice, violated the Fourteenth Amendment.  The district court agreed, finding that "the past practice of the Alabama election officials prior to [the] general election has been to refrain from counting any absentee ballot that did not include notarization or the signatures of two qualified witnesses," that "the past practice of the Secretary of [the] State of Alabama has been to certify Alabama election results on the basis of vote counts that included absentee votes cast only by those voters who included affidavits with either notarization or the signatures of two qualified witnesses," and that the circuit court's order changed this past practice.  Id. at 579.  The district court ordered that the contested ballots be preserved and protected; that the Secretary refrain from certifying election results based on a vote count that included the contested absentee ballots; that Alabama's sixty-seven county election officials forward vote totals to the Secretary without counting the contested absentee ballots; and that the Secretary, upon receipt of those vote totals, certify the election results.  Id.

Defendants appealed, and we certified the question to the Alabama Supreme Court: "WHETHER ABSENTEE BALLOTS THAT, ON THE ACCOMPANYING AFFIDAVIT ENVELOPE, FAIL TO HAVE TWO WITNESSES AND LACK PROPER NOTARIZATION . . . MEET THE REQUIREMENTS OF ALABAMA LAW . . . TO BE COUNTED IN THE NOVEMBER 8, 1994 GENERAL ELECTION." Roe I, 43 F.3d at 583.  The Alabama Supreme Court answered in the affirmative, stating that the signature of the voter alone, if accompanied by the voter's address and reason for voting absentee, satisfies the statute's requirements.  Roe v. Mobile County Appointment Bd., No. 1940461 (Ala. March 14, 1995). After receiving the supreme court's response, we remanded the case to the district court for a determination of whether, prior to and at the time of the November 8, 1994 general election, the practice in Alabama had been to reject or, conversely, to count absentee ballots whose envelope did not include the signature of either a notary public or two witnesses.  Roe v. Alabama, 52 F.3d 300 (11th Cir. 1995) ("Roe II").  The district court found, after trial of the case, that the practice in Alabama prior to the November 8, 1994 election, had been uniformly to exclude ballots not in conformity with the literal requirements of the statute.  Given this finding, the district court concluded that the plaintiffs were entitled to relief, for "to include the contested ballots in the vote totals would depreciate the votes of [the plaintiff class]" in violation of the Fourteenth

32

Amendment. Roe III, 68 F.3d at 407. The district court entered a permanent injunction that, among other things, directed the Secretary of State to certify the results of the elections.

Defendants again appealed, arguing that the court should have given effect to the Supreme Court of Alabama's answer to the certified question. We noted in response that "the Alabama Supreme Court, in answering our question, construed an Alabama statute; the court did not, and was not called upon to, decide whether the counting of the contested ballots cast in the . . . election – in the face of Ala. Code § 17-10-4 and in the face of a uniform state-wide practice of excluding such ballots – infringed the [plaintiff] class' constitutional rights." Id. at 409. We affirmed the decision of the district court, confirming our conclusion in Roe I that such a post-election change in the applicable law "demonstrated fundamental unfairness." Roe I, 43 F.3d at 580.

As in Roe, the appropriate analysis in this case begins with an examination of Florida's past practice in tallying its election results. The past practice of Florida counties using machine-read ballots (whether they are optical scanning or punchcard ballots) has been to certify the machine tabulation of votes as the county's official vote count. In keeping with that practice, no counties in the November 7 election supplemented the machine counts with hand counts of undervoted ballots before submitting their results to the Secretary of State. If the machines were merely

33

screeners[40] on November 7 as the selective dimple model presumes, then the election

officials in each county should have examined all undervoted ballots on the night of the

election.   That they did not do so is evidence that either the Florida Supreme Court

changed the election law, or that county election officials were shirking their duties.

The interpretations of the election statutes promulgated by Florida election

officials before the state supreme court's decision are also of paramount interest.  The

Secretary of State is the chief election officer of Florida, and it is her responsibility to

"[o]btain and maintain uniformity in the application, operation, and interpretation of the

election laws."[41]  Fla. Stat. § 97.012(1) (2000).

Pursuant to section 106.23(2),[42] the Division of Elections, a division within the

Department of State, issued three advisory opinion letters on November 13, 2000,

---

[40] As described in Part II.B.2, supra, under the selective dimple model the vote tabulating
machine acts as a screener, recording votes that were properly cast, but does not count all valid
votes.

[41] In so doing, the Secretary of State must take steps to "[p]rovide training to all affected
state agencies on the necessary procedures for proper implementation
of [the election laws]."  Fla. Stat. § 97.012(8) (2000).

[42]
The Division of Elections shall provide advisory opinions when requested by any
supervisor of elections, candidate, local officer having election-related duties, political
party, political committee, committee of continuous existence, or other person or
organization engaged in political activity, relating to any provisions or possible violations
of Florida election laws with respect to actions such supervisor, candidate, local officer
having election-related duties, political party, committee, person, or organization has
taken or proposes to take.
Fla. Stat. § 106.23(2).

34

advocating the machine model for counting votes under the statutory system.  The letters were written in response to requests asking the Division to define the meaning of "error in the vote tabulation" in the statutory manual recount provision.  The Division stated that "'[a]n error in the vote tabulation' means a counting error in which the vote tabulation system fails to count . . . properly marked marksense or properly punched punchcard ballots."  Advisory Opinion Letter from L. Clayton Roberts, Director, Division of Elections, Nov. 13, 2000.  Significantly, the Division opined that the "inability of a voting system[] to read an . . . improperly punched punch card ballot . . . is not an 'error in the vote tabulation.'"  Id.

Apparently, however, state officials could not agree about the meaning of the phrase "error in the vote tabulation."  Attorney General Robert Butterworth, in a letter to the Palm Beach County Canvassing Commission, took issue with the November 13 opinion issued by the Division of Elections.  He noted in his letter that "[t]he division's opinion is wrong is several respects," and stated that "[w]here a ballot is so marked as to plainly indicate the voter's choice and intent, it should be counted as marked unless some positive provision of law would be violated."  Letter from Robert A. Butterworth to Hon. Charles Burton, November 14, 2000.  Insofar as Attorney General Butterworth's statement can be read to suggest that all ballots with undervoted ballots should have been examined on November 7, it is noteworthy that no county canvassing

board member has, to my knowledge, been charged with neglect of duty under Fla. Stat. § 104.051 for failure to take such action. <u>See</u> Fla. Stat. § 104.051 ("Any official who willfully refuses or willfully neglects to perform his or her duties as prescribed by this election code is guilty of a misdemeanor of the first degree.").

The legislative history of the manual recount provision also indicates that it was added to ensure an accurate count of <u>properly</u> cast (as opposed to dimpled or otherwise mismarked) votes. The manual recount provision was enacted as part of the Voter Protection Act of 1989 to provide a remedy to candidates who believed the vote tabulating equipment was not working properly in a given county. The Senate Staff Analysis and Economic Impact statement on the legislation indicated that it was enacted, in part, in response to a problem in a prior election in which "an apparent software 'glitch' or error was responsible for an incident in Ft. Pierce when a machine would count the Democratic votes, but would not accept Republican ones." <u>Bush v. Palm Beach County Canvassing Bd.</u>, Pet. For Cert. Resp. of Harris, p. 13 n.10, <u>cert. granted</u> (No. 00-836).

As the evidence shows, then, <u>Harris</u> interpreted the state election system in a way that was inconsistent with previous state practice. If this was a post-election changing of the rules, rather than merely an interpretation of an ambiguous vote counting model, such a change is fundamentally unfair in three ways. First, deciding

<u>after</u> the election to count votes that do not satisfy requirements set forth <u>before</u> the election dilutes the votes of those who attended the polls and indicated their intent in accordance with the instructions.[43] This is directly analogous to the violation in <u>Roe</u>. <u>Cf. Roe I</u>, 43 F.2d at 581.

Second, to the extent that <u>Harris</u> constitutes a change in election procedures, it creates a vote dilution problem more egregious than that in <u>Roe</u>. In addition to dilution caused by counting improperly executed ballots that nevertheless express a clear intent to cast a vote, Florida voters also suffer from dilution by the inevitable counting of markings on ballots that were <u>not</u> intended as votes.[44] The wholly arbitrary standards

_____

[43] For the instructions at the polling places in Palm Beach County, for example, <u>see</u> <u>supra</u> note 19. Given these or similar instructions, it was reasonable for voters to believe that the only marking of a ballot that would be counted as a valid vote would be the complete punching and removal of a chad from the ballot. Presentation of a ballot with these instructions is analogous to the offer and acceptance in unilateral contract formation, where the offeror instructs the offeree on how to accept the offer, and only that method of acceptance creates a valid contract. The offeree knows that he has not accepted the contract if he has made any indications of intended acceptance other than strict compliance with the method specified by the offeror. Similarly, the county instructs voters how to mark their ballots to cast a vote; reasonable voters can expect that they must comply with those instructions to cast a valid vote.

[44] I note in passing that significant First Amendment concerns are raised when political speech in the form of a vote is attributed to a person who intended to refrain from speaking. <u>See</u> <u>Pacific Gas & Elec. Co. v. Public Util. Comm'n</u>, 475 U.S. 1, 16, 106 S. Ct. 903, 912, 89 L. Ed. 2d 1 (1986) ("[T]he choice to speak includes within it the choice of what not to say."). For instance, consider a voter who intended not to vote in the contest for President/Vice President on the ballot. In the process of voting in other contests, he may have inadvertently placed the stylus on the hole for the contest of President/Vice President, thereby leaving an indentation. Relying on the instructions that require the chad to be "cleanly punched . . . [with] no chips left hanging," that voter may not have requested a new ballot. The application of the selective dimple model leaves open the very real possibility that a county canvassing board attributes speech to this voter by misreading his indentation as a vote. Despite this possible constitutional infringement, it is

37

for determining voter intent in various counties ensure the erroneous addition of countless non-votes to a candidate's tally. This bolsters plaintiffs' claim of a <u>Roe</u>-type violation, which dilutes the votes of bona fide voters in violation of the First and Fourteenth Amendments.[45]

Third, if <u>Harris</u> changed the definition of a "valid vote" <u>after</u> the running of statutory limitations period within which a candidate could ask for a manual recount, such a change would work fundamental unfairness. By the time the court's decision was announced on November 21, the time limit in which the candidates or their parties could request manual counts had elapsed. Had the candidates known that Florida's statutory election system allowed the selective mining of votes through its manual recount provision, they might have made use of the system to request that at least some of the 180,000 ballots containing non-votes in the presidential race be examined sometime <u>before</u> November 21. The court presumably recognized this problem when

_____

impossible to determine which voter's "dimples" were counted, and which were disregarded as non-votes.

[45] In <u>Roe</u>, there was no concern that the intent of the voters who cast the contested ballots would be misconstrued; the voter's intent was unambiguous. <u>Roe I</u>, 43 F.3d at 581. Counting the contested votes in that case would have diluted valid votes solely because the invalid votes were executed improperly.

it offered to extend the time period for requesting manual counts.[46] <u>Harris</u>, Nos. SC00-2346, SC00-2348 & SC00-2349.

I find plaintiffs' argument that the court retroactively changed the state's vote counting model extremely persuasive. Because of past practice, interpretations of state officials prior to <u>Harris</u>, and the legislative history, I believe that the Florida Supreme Court superimposed a new model onto the state's statutory election scheme. Because of this circuit's clear precedent in <u>Roe</u>, I would hold that the Florida Supreme Court unconstitutionally changed the election system after the election had taken place. This alone is reason to reverse.

Even if I am incorrect in assessing <u>Harris</u> as a post-election change in violation of <u>Roe</u>, plaintiffs' allegations that the selective dimple model itself is constitutionally infirm warrant a full analysis.

IV.

---

[46] Notably, however, the court inquired whether the candidates would want to request a recount in other counties despite the running of the time period, and the candidates chose not to make any requests. <u>Harris</u>, Nos. SC00-2346, SC00-2348 & SC00-2349 at 40, n. 56 ("At oral argument, we inquired as to whether the presidential candidates were interested in our consideration of a reopening of the opportunity to request recounts in any additional counties. Neither candidate requested such an opportunity."). One wonders whether, had the candidates accepted the Florida Supreme Court's offer to reopen the time period to request manual recounts in other counties, county canvassing boards would nevertheless have retained discretion to refuse a candidate's request.

Florida law gives every qualified voter one vote in its statewide election of presidential electors.   In counting those votes under the selective dimple model, however, it employs a county unit system which works to disenfranchise voters based on where they reside.  As noted in my description of the selective dimple model, voters who express their intent to vote for President in a manner undetectable by a vote tabulating machine will have their votes counted only at the behest of a candidate or political party.  The statutes provide no way for a voter, himself, to demand that his "dimple" or other marking be counted before the vote total is certified; he must wait for a qualified partisan proxy to do it for him.[47]  If no qualified proxy requests a manual count, the untabulated votes simply remain uncounted.

The selective disenfranchisement caused by the selective dimple model implicates two similar but distinct fundamental rights: the right to vote and the right of freedom of association.  These rights, embodied in the First Amendment, are enforced against the states by the Fourteenth Amendment.  The Equal Protection Clause of the

---

[47] This model for "recounting" votes in certain counties not only relies on candidates to select the counties, but it effectively restricts the candidates who may obtain a recount to the major party candidates.  This is so because section 102.166(5) only permits manual counts if the board finds that it "could affect the outcome of the election."  Third party candidates for whom vote totals are critical if they wish to obtain federal funds for their party in the next election are left out of this process and their voters are left relying on other candidates to choose their county.  The same problem exists under the provision for contesting elections.  Fla. Stat. § 102.168(3)(c).  If the ground for the contest is that legal votes were not counted, the contest provision requires that a sufficient amount of the legal votes not counted "change or place in doubt the result of the election" before the contest may proceed.  Fla. Stat. § 102.168(3)(c).

40

Fourteenth Amendment guarantees, as its name suggests, that no person shall be denied "equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, I first examine in Part A, Sections 1 and 2, whether the selective dimple model impermissibly classifies and discriminates against certain voters or groups of voters. I then turn in Part B to an analysis of the vote counting scheme under the Due Process Clause of the Fourteenth Amendment, which guarantees that no State "shall deprive any person of life, liberty, or property, without due process of law." Id. The concept of "liberty," as interpreted by the United States Supreme Court, includes a right to freedom of association. See NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 460, 78 S. Ct. 1163, 1171, 2 L. Ed. 2d 1488 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). My inquiry, therefore, focuses on whether the Florida vote counting scheme, as applied in this case, infringes upon plaintiffs' right of association in violation of the Due Process Clause.

## A.

### 1.

41

Under the selective dimple model, if a candidate in a Florida statewide race is trailing his opponent by a small number of votes following the machine counts, his only chance to win is to mine for additional votes via manual counts.[48] The candidate will turn, naturally, to those counties in which he believes he can make up the difference. As discussed in Part II.B.2, supra, in considering whether to ask for a manual count in a particular county, a candidate will consider (1) the percentage of the vote he has carried in the county thus far, (2) the size of the county, and (3) the political makeup of the decision-making body in the county. Thus, a candidate would, under the current system, be likely to ask for manual counts in large counties in which his party predominates.

These observations underscore the adversarial structure of the Florida scheme which allows candidates to play games with individual rights. The selective dimple model puts voters in no better a position than children in a schoolyard game yelling, "Pick me, pick me!" The candidates, as team captains, will only choose those who are sure to help them win. Smaller, less populated counties – like frail schoolchildren – have almost no chance of being picked.[49] At the end of choosing teams, those who

---

[48] The frontrunner, on the other hand, is seemingly unable to get a county-wide manual count under the selective dimple model, as he could never show that an additional number of votes for him "could affect the outcome of the election." Fla. Stat. § 102.166(5).

[49] As noted in my description of the manual count statute, a full manual count should only occur when the sampling of precincts shows "an error in vote tabulation that could affect the

aren't chosen simply don't get to play. This scheme clearly contravenes the long-settled principle that "[q]ualified citizens not only have a constitutionally protected right to vote, but also the right to have their votes counted." <u>Duncan v. Poythress</u>, 657 F.2d 691, 700 (5th Cir. Unit B 1981), citing <u>Ex parte Yarbrough</u>, 110 U.S. 651, 45 S. Ct. 152, 28 L. Ed. 274 (1884), and <u>United States v. Mosley</u>, 238 U.S. 383, 35 S. Ct. 904, 59 L. Ed. 1355 (1915). As Justice Douglas wrote in <u>Gray v. Sanders</u>, 372 U.S. 368, 379-80, 83 S. Ct. 801, 808-09, L. Ed. 2d 821 (1963):

> [o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote – whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many [United States Supreme Court] decisions.

The Florida vote counting model, as interpreted by the Florida Supreme Court, works to deprive voters of their right to vote based on their county of residence and thereby denies them equal protection of the laws.[50]

---

outcome of the election." Fla. Stat. § 102.166(5). The number of dimpled ballots generated in a sparsely populated county will almost certainly never be enough to make the requisite showing, thus the voters in small Florida counties – like the kid with two left feet – will never be invited to the big dance.

[50] It is well-established that "to meet the standing requirements of Article III . . . a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that

43

the alleged injury is particularized as to him.'" Raines v. Byrd, 521 U.S. 811, 818-19, 117 S. Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). "Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of rights of third persons not parties to the litigation." Singleton v. Wulff, 428 U.S. 106, 113, 96 S. Ct. 2868, 2874, 49 L. Ed. 2d 826 (1976). The plaintiffs in the instant case have not specifically alleged that they were disenfranchised by the state election scheme, and thus arguably may not have a "personal" equal protection claim in the nature discussed supra Part IV.A.1. While a party may not ordinarily claim standing to vindicate the constitutional rights of some third party, this is a prudential, rather than jurisdictional, rule of practice. The rule has been relaxed in cases where a plaintiff alleging his own injury is asserting "concomitant rights of third parties that would be 'diluted or adversely affected' should [his] constitutional challenge fail." Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) (allowing saloon keeper suffering economic injury to raise equal protection rights of young men to buy beer at the same age as women); see also Carey v. Population Servs. Int'l, 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977) (allowing corporate seller of contraceptives to challenge state statute prohibiting sale of contraceptives to persons under 16 years old); Pierce v. Society of Sisters, 268 U.S. 510, 545, S. Ct. 571, 69 L. Ed. 1070 (1925) (allowing a private and a parochial school to assert constitutional rights of parents and guardians to direct the upbringing and education of their children).

The Supreme Court has looked primarily to two factual elements to determine whether the rule against asserting the rights of third parties should apply in a particular case:

The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

Singleton, 428 U.S. at 114-15, 96 S. Ct. at 2874. In the instant case, third parties' enjoyment of their right of suffrage is "inextricably bound up with the activity [plaintiffs] wish to pursue" – associating with and preserving the political strength of their party's supporters. It will be impossible for plaintiffs to associate with other voting members of their party if those voters are disenfranchised. As the remedy sought by the plaintiffs will effectively vindicate the rights of the third parties, the plaintiffs are fully effective as a proponent for the third party interests.

Finally, I note an additional consideration weighing heavily in favor of granting plaintiffs third party standing (or standing to raise a personal disenfranchisement claim): It would be difficult, if not impossible, to know exactly which voters were disenfranchised by the state election scheme. Even if voters could remember whether they had dimpled their chads rather than punching them through, an allegation to that effect would be entirely self-serving and impossible to corroborate. To require such a showing as an element of standing would either bar disenfranchisement suits altogether or encourage perjury in the complaint. Moreover, even those voters who recall dimpling or improperly marking their ballots cannot prove whether those "votes" were counted. From a prudential standpoint, therefore, it would be unreasonable to insist

2.

In addition to facilitating discrimination against individuals on a geographical basis, the selective dimple model encourages wily candidates to fence out voters on the basis of their party affiliation. Plaintiffs claim that, as Bush voters, their vote has been diluted by the selective enfranchisement of dimple voters in heavily populated, predominately Democratic counties. Specifically, they allege that Vice President Gore and the Democratic Party requested and received manual counts in Volusia, Palm Beach, Broward, and Miami-Dade counties – all counties in which he received approximately six out of every ten machine-counted votes. His opponent, Governor Bush, did not request manual counts in any county.[51] I agree that the selective dimple model, as applied, is tailor-made for unconstitutional party-based discrimination.

"The right to form a party for the advancement of political goals means little if a party can be . . . denied an equal opportunity to win votes." Williams v. Rhodes, 393

---

that the equal protection claim could only be raised by such unidentifiable, or indeed fabricated, plaintiffs. Cf. NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 459, 78 S. Ct. 1163, 1170, 2 L. Ed. 2d 1488 (1958) ("The [standing] principle is not disrespected where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court.").

[51] Indeed, as I have noted, Bush's requests would likely have been futile – no amount of dimple votes in his favor "could [have] affect[ed] the outcome of the election." Fla. Stat. § 102.166(5).

U.S. 23, 31, 89 S. Ct. 5, 10-11, 21 L. Ed. 2d 24 (1968). Under the selective dimple model, the state encourages candidates to wield the manual count provision as a sword to cut down the strength of an opposing party's support. The game is best played by the candidate who is able to enfranchise scores of his own supporters while validating as few extra votes as possible for his opponent. Plainly, then, the vote counting scheme encourages candidates to discriminate between groups of voters – organized in county units – based on the predominant party affiliation of each county's voters.

The question is whether this gamesmanship works a constitutional injury not only to the individual voters who are not chosen for enfranchisement, but also to those groups of voters whose power is intentionally and systematically diluted by the selective validation of votes for an opposing party's candidate. Riddell v. National Democratic Party, 508 F.2d 770, 777 (5th Cir. 1975) ("Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents."). "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." Snowden v. Hughes, 321 U.S. 1, 8, 64 S. Ct. 397, 401, 88 L. Ed. 497 (1944); see also Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980). Such discrimination "may appear on the face of the action taken with

46

respect to a particular class or person, or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself." Snowden, 321 U.S. at 8, 64 S. Ct. at 401. Additionally, "the determination that particular conduct constitutes a constitutional deprivation rather than a lesser legal wrong depends on the nature of the injury, whether it was inflicted intentionally or accidentally, whether it is part of a pattern that erodes the democratic process or whether it is more akin to a negligent failure properly to carry out the state ordained electoral process and whether state officials have succumbed to 'temptations to control . . . elections by violence and by corruption.'" Gamza, 619 F.2d at 453.

The action taken in the instant case by Vice President Gore and the Democratic Party, in selecting heavily populated, predominately Democratic counties in which to request manual counts, evinces purposeful discrimination against voters who reside in non-Democrat-dominated counties. The injury inflicted upon his opponent's supporters is planned vote dilution – undoubtedly "a pattern that erodes the democratic process." This injury is certainly actionable, for "the right to associate with the political party of one's choice is an integral part of [First and Fourth Amendment] freedoms," Communist Party v. Whitcomb, 414 U.S. 441, 449, 94 S. Ct. 656, 662, 38 L. Ed. 2d

47

635 (1974), and purposeful, systematic disenfranchisement of a party's members interferes with the ability of the group to express its ideas as a whole.

Given the Florida Supreme Court's endorsement of what I have been calling the selective dimple model, I feel confident in saying that planned vote dilution by use of selective manual counts will not be an isolated event in Florida's statewide elections.[52] Furthermore, that such action is advocated by the State in its statutory election system, and sanctioned when the vote totals are certified by the state Election Canvassing Commission is, I believe, sufficient to deem it state action for purposes of section 1983. Where there exists such a state sanctioned discriminatory scheme targeting a particular

---

[52] The Supreme Court's plurality decision in Davis v. Bandemer, 478 U.S. 109, 106 S. Ct. 2797, 92 L. Ed. 2d 85 (1986), a political gerrymandering case, does not undermine my conclusion. Justice White, writing for four members of the Court, stated that in political gerrymandering cases, an equal protection violation may be found only where there is evidence of "continued frustration of the will of a majority of voters or effective denial to a minority of voters of a fair chance to influence the political process." Id. 478 U.S. at 133, 106 S. Ct. at 2811. The rationale behind the rule was articulated thus:

> [I]n determining the constitutionality of multi-member districts challenged as racial gerrymanders, . . . we have required that there be proof that the complaining minority "had less opportunity . . . to participate in the political processes and to elect legislators of their choice." . . . This participatory approach to the legality of individual multimember districts is not helpful where the claim is that such districts discriminate against Democrats, for it could hardly be said that Democrats, any more than Republicans, are excluded from participating in the affairs of their own party or from the processes by which candidates are nominated and elected. For constitutional purposes, the Democratic claim in this case . . . boils down to a complaint that they failed to attract a majority of voters in the challenged multimember districts.

478 U.S. at 136-37, 106 S. Ct. at 2812-13. Davis is therefore inapposite here, where the evidence supports the plaintiffs' allegation that voters in non-Democratic counties are "excluded from participating in the affairs of their own party" and "from the processes by which candidates are . . . elected."

48

group of voters on the basis of their political association, relief under the equal protection clause is not only appropriate, but is required. See Snowden, 321 U.S. at 11, 64 S. Ct. at 402 ("Where discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights."); see also Shakman v. Democratic Org., 435 F.2d 267, 270 (7th Cir. 1970) ("The equal protection clause secures from invidious official discrimination the voter's interest in a voice in government of equal effectiveness with other voters.").

## B.

In addition to encouraging unlawful discrimination against voters based on their county of residence or political affiliation, it is clear that Florida's vote counting scheme for statewide elections unconstitutionally burdens a fundamental right secured by the Constitution: the freedom of association. "[T]he right of individuals to associate for the advancement of political beliefs . . . rank[s] among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30, 89 S. Ct. 5, 10, 21 L. Ed. 2d 24 (1968). As explained above, the right to freedom of association is guaranteed by the First Amendment and protected against state impairment by the Due Process Clause of the Fourteenth Amendment. See id. at 30-31.

49

On November 7, plaintiffs expressed their beliefs about who should hold the office of President of the United States.  Similarly, by voting in the national election, all Bush voters expressed the same sentiment.  In other words, plaintiffs and Bush voters attempted to associate collectively for the advancement of the belief that George W. Bush should be President of the United States.  The right of association protects this activity of  "engag[ing] in association for the advancement of beliefs and ideas."  NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 460, 78 S. Ct. 1163, 1171, 2 L. Ed. 2d 1488 (1958).

By counting the dimpled votes in some but not all counties, the state of Florida infringes upon the plaintiffs' right, and the right of all voters, to associate for the advancement of their favored political candidate.  See Sowards v. Loudon County, Tenn., 203 F.3d 426, 432 (6th Cir. 2000) (stating "[s]upport of a political candidate falls within the scope of the right of political association") and Mariani v. United States, 212 F.3d 761, 771 (3d Cir. 2000) (stressing "the right to association through support of the candidate of one's choice").[53]  Consider, for example, a Bush voter in Brevard County whose vote was counted by the vote tabulating machine; his right to political association is diminished when other votes for Bush are not counted.  Just as plaintiffs' freedom of association "encompasses 'the right to associate with the political

---

[53] Specifically at issue in these cases were laws relating to political contributions.

party of one's choice,'" see Buckley v. Valeo, 424 U.S. 1, 15, 96 S. Ct. 612, 633, 46

L. Ed. 2d 659 (1976), plaintiffs' right also entails the freedom to associate with like-

minded voters in support of a candidate of their choice.

Once it decided that dimples were valid votes, but that those votes would be

counted only in counties selected by the candidates, the Florida Supreme Court's

decision disenfranchised dimple voters in the remaining counties and thereby trampled

the right of association enjoyed by plaintiffs and all Florida voters.  The selective

dimple model inhibits voters from demonstrating their true electoral strength.  By

interfering with plaintiffs' ability to associate with other Bush voters so as to "enhance

their political effectiveness as a group," see Patriot Party of Allegheny Cty. v.

Allegheny County Dep't of Elections, 95 F.3d 253, 262 (3d Cir. 1996) (citing

Anderson v. Celebrezze, 460 U.S. 780, 794, 103 S. Ct. 1564, 1572-73, 75 L. Ed. 2d

547 (1983)), the selective dimple model denies plaintiffs' and other Bush voters the

fruits of their association, to wit: their political impact.[54]  See Republican Party of

Conn. v. Tashjian, 770 F.2d 265, 278 (2d Cir. 1985) (explaining "[t]the Williams Court

_____

[54] A Gore voter in Brevard County (or any of the non-recount counties) is similarly
affected.  One may argue that a Gore voter's right to political association is not infringed because
dimpled votes are being counted in the counties selected by Vice President Gore.  Even so, there
are undoubtedly Gore voters who dimpled their ballots in the counties which did not conduct
manual recounts, and those votes are not being counted.  Thus, a Gore voter's right to political
association was abridged also once Florida decided that: (1) dimpled chads are valid votes, and
(2) these votes would be counted only at the candidates' request.

intimated that a statutory regime denying a group the fruit of their association – political impact – runs afoul of the first amendment no less than one precluding association itself" (quoting L. Tribe, American Constitutional Law 779 (1978)).

"Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 460, 78 S. Ct. 1163, 1171, 2 L. Ed. 2d 1488 (1958). As such, this constitutional right may be limited only when "a compelling state interest in the regulation of a subject within the State's constitutional power to regulate exists." NAACP v. Button, 371 U.S. 415, 438, 83 S. Ct. 328, 341, 9 L. Ed. 2d 405 (1963); see also Williams, 393 U.S. at 31, 89 S. Ct. at 11. I can find no compelling interest in Florida's vote-counting scheme that counts some valid votes but not others. See Williams, 393 U.S. at 32-33, 89 S. Ct. at 11 (explaining that due process requires that the state accomplish its goal of administering elections narrowly and fairly to avoid diluting these fundamental liberties"); see also Riddell v. National Democratic Party, 508 F.2d 770, 776-77 (5th Cir. 1975) (citing Kusper v. Pontikes, 414 U.S. 51, 57, 94 S. Ct. 303, 307, 38 L. Ed. 2d 260 (1973) (stating "'[t]he states may not infringe upon basic constitutional protections' and 'unduly restrictive state election laws may so impinge upon freedom

52

of association as to run afoul of the First and Fourteenth Amendments'"")). Accordingly, I would hold that the state of Florida's current election scheme infringes upon plaintiffs' right to association in violation of the First and Fourteenth Amendments.

## V.

## A.

The majority holds that plaintiffs have failed to demonstrate an irreparable injury, and thus we need not consider the likelihood of success on the merits.  This holding can mean one of two things: either the majority is contending that plaintiffs have suffered no injury, or that the injury that has been suffered is reparable.  We consider each of these possibilities in turn.

If the majority is resting its decision on the ground that plaintiffs have suffered no injury, then it has agreed with the argument of the appellees and the Attorney General that an injury does not exist in this case because plaintiffs voted for the putative winner, George W. Bush.  In other words, unless a voter cast his vote for a losing candidate, the voter cannot be found to have suffered any cognizable constitutional injury – the existence of his constitutional right is dependent upon the outcome of the election.  It defies common sense, however, to suggest that a voter has

no cause of action for the debasement of his vote, and the consequent denial of the equal protection of the laws, <u>unless</u> his candidate has lost the election.

Once it is clear that plaintiffs' constitutional rights are not dependent upon the outcome of the election, the question becomes whether and when plaintiffs suffered any redressable injury. I contend that the injury to the voters in the instant case occurred once the time limit for requesting manual recounts had expired, and at least one but not all counties had certified results containing manual recounts conducted pursuant to § 102.166.[55]   It was at that moment we could be sure that some voters had been disenfranchised, while others had suffered a debasement of their vote by the selective addition of dimpled votes to the total. Thus, it is clear under federal law and under the facts of this case that plaintiffs have suffered a constitutional injury.

Perhaps, then, the majority did not mean to say that plaintiffs suffered no injury, but that whatever injury they may have suffered was not irreparable. It was posited to the court during oral argument that even if plaintiffs had been injured, they still had adequate redress in the state courts.[56]   This is a wholly fallacious argument. A voter

---

[55] I am not including those manual recounts conducted merely to verify the machine total.

[56] During oral argument yesterday, the Florida Democratic Party and the Florida Attorney General contended that because the state has a complex scheme for contesting elections, lower federal courts have no role in adjudicating even a voter's federal constitutional claims, such as those set forth by plaintiffs in this case. The net effect of their argument is that the United States Supreme Court is the only federal forum available to plaintiffs.

may bring a contest suit in state court on the ground that legal votes were excluded or illegal votes included, but must show that such action was sufficient to "change or place in doubt the result of the election." Fla. Stat. § 102.168(3)(c). Clearly, then, a Bush voter could not maintain a contest suit – he could neither allege nor establish that the inclusion of other legal votes, or the exclusion of illegal votes, would change the outcome of the election.[57] The state remedy, therefore, is no remedy at all for voters who have suffered constitutional injury while attempting to vote for the winning candidate.[58]

Not only is plaintiffs' injury not redressable by the state courts, but it continues to compound itself by the day. The uncertainty regarding the integrity of the presidential election in Florida has cast a pall of illegitimacy over the entire process. If the federal constitutional principle is that plaintiffs have a cause of action without having to show that their candidate lost, but should have won, there is no other remedy

---

[57] Similarly, a voter who dimpled his ballot in favor of a losing candidate in a non-recount county will not be able to get his vote counted, unless he can prove that the inclusion of more legal votes, or the exclusion of illegal votes, could "change or place in doubt the result of the election." If the candidate for whom he voted was defeated by a significant margin (such as a third party candidate), he is effectively precluded from bringing a meritorious suit. This is true even though minor party voters have a strong associational interest in having all votes for their candidate counted so that they may obtain matching federal funding.

[58] I understand, of course, that a section 1983 action, stating the same constitutional claims as the complaint before us, may be brought in state court. I do not read the majority opinion, however, to suggest that such recourse is mandatory, or that plaintiffs must exhaust their state remedies before bringing their claim to federal court.

55

available.  The constitutional injury has been suffered and is not ameliorated by inaction.  Plaintiffs have no viable recourse in the state courts.  The constitutional question is before us, and time is of the essence.

## B.

This case is before our court as an appeal of a district court order denying a motion for a preliminary injunction.  Had nothing of relevance transpired since the district court issued its order, we would simply ask whether, given the record before it, the district court abused its discretion in denying relief.  See Panama City Med. Diagnostic v. Williams, 13 F.3d 1541, 1545 (11th Cir. 1994).[59]  This is the track the majority chooses to take.

However, many events of relevance have taken place since the district court made its ruling.  This court has been apprised of these events by the parties' supplemental filings and oral argument.  Most important of these subsequent events is the Florida Supreme Court's definitive interpretation of the Florida system of

---

[59] Specifically, we would ask first whether the district court erred in holding that plaintiffs failed to establish the first prerequisite for a preliminary injunction.  This Circuit has established a four-pronged test for a plaintiff to obtain a preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury; (3) that [their] own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not disserve the public interest."  Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir. 1999).

conducting state-wide elections: Florida employs the selective dimple model.[60]  This

interpretation has crystalized plaintiffs' claims into pure questions of law.  This court

can and should determine – without the necessity of further proceedings in the district

court – whether the selective dimple model has deprived plaintiffs of fundamental

constitutional rights.  Instead, the majority elects to act as if the situation had not

changed, as if we had not asked to be updated on ongoing developments, and as if there

is no constitutional violation and injury at all.


## C.

When a case is on appeal from the denial of a preliminary injunction, it may be

reviewed on the merits "if a district court's ruling rests solely on a premise as to the

applicable rule of law, and the facts are established or of no controlling relevance."

Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 757,

106 S. Ct. 2169, 2177, 90 L. Ed. 2d 779 (1986), rev'd on other grounds by Planned

Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S. Ct. 2791, 120

L. Ed. 2d 674 (1992); Donovan v. Bierwirth, 680 F.2d 263, 270 (2d Cir. 1982) (ruling

---

[60] The fact that the United States Supreme Court has vacated the Florida Supreme Court decision which instituted the selective dimple model does not alter the fact that the selective dimple model has governed the counting of ballots and the certification of votes in this presidential election.

on the merits of an injunction, in an appeal from the grant of a preliminary injunction, because the "quarrel is over the legal standard and its application to facts not seriously in dispute"). In the instant case, intervening events have narrowed the issues in this appeal to pure questions of constitutional law.

To obtain a permanent injunction, as opposed to a preliminary injunction, plaintiffs must show not just "a substantial likelihood of success on the merits" – the first of four requirements for a preliminary injunction – but must demonstrate <u>actual</u> success on the merits. See <u>Amoco Prod. Co. v. Village of Gambell, Alaska</u>, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 1404 n.12, 94 L. Ed. 2d 542 (1987). My analysis reveals, beyond any doubt, that the state of Florida has infringed plaintiffs' rights under the First and the Fourteenth Amendments. Moreover, there can be no doubt that plaintiffs' injury is real and ongoing. Accordingly, there is no need to remand this case to the district court for further proceedings. See <u>Clements Wire & Mfg. Co. v. NLRB</u>, 589 F.2d 894 (5th Cir. 1979) (ruling on the merits of a claim, even though the appeal related only to a preliminary injunction, where it was clear that one side could not prevail);[61] <u>Illinois Council on Long Term Care v. Bradley</u>, 957 F.2d 305, 310 (7th Cir. 1992) ("Since plaintiffs cannot win on the merits, there is no point in remanding the

---

[61] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

58

case for further proceedings."). To remand now is a waste of judicial energy and resources and withholds from plaintiffs the relief they are entitled to receive at this very moment. See Thornburgh, 476 U.S. at 757, 106 S. Ct. at 2177 (holding that a court of appeals' usual limitation to review of a preliminary injunction for abuse of discretion "is a rule of orderly judicial administration, not a limit on judicial power"); Doe v. Sundquist, 106 F.3d 702, 707 (6th Cir. 1997) ("The sort of judicial restraint that is normally warranted on interlocutory appeals does not prevent us from reaching clearly defined issues in the interest of judicial economy.").

I would direct the district court to enjoin the Secretary of State and/or Elections Canvassing Commission to issue amended vote certifications under Fla. Stat. §§ 102.121 and 103.011 that do not contain the results of manual recounts conducted in response to a candidate or political party's request under Fla. Stat. § 102.166 (namely Volusia, Broward, Miami-Dade and Palm Beach Counties). I would further enjoin the Secretary of State and/or the Elections Canvassing Commission from issuing any future certification that includes manual recounts requested by a candidate or political party in select counties pursuant to Fla. Stat. § 102.166.

I respectfully dissent.

BIRCH, Circuit Judge, dissenting; in which TJOFLAT and DUBINA, Circuit Judges, join:

While I concur in the dissenting opinions by my colleagues, Judges Tjoflat, Dubina and Carnes, my concern about the constitutional deprivations alleged in these cases is focused on the lack of standards or guiding principles in the Florida manual recount statute. Florida's statutory election scheme envisions hand recounts to be an integral part of the process, providing a check when there are "error[s] in the vote tabulation which could affect the outcome of the election." *See* Fla. Stat. Ann. § 102.166(5). The 1989 Florida legislature, however, abdicated its responsibility to prescribe meaningful guidelines for ensuring that any such manual recount would be conducted fairly, accurately, and uniformly. While Florida's legislature was unquestionably vested with the power under Article II, Section One of the United States Constitution to devise its own procedures for selecting the state's electors, it was also required to ensure that whatever process it established comported with the equal protection and due process requirements of the Fourteenth Amendment to that same Constitution.[1] Other states, such as Indiana, have provided clear and definitive standards under which manual recounts are to be conducted. *See* Ind. Code § 3-12-1-

---

[1]*See Moore v. Ogilvie*, 394 U.S. 814, 818-19, 80 S.Ct. 1493, 1496 (1969) (discussing the applicability of the Fourteenth Amendment to the nominating process for presidential candidates).

9.5 (providing in part that chads that have been pierced count as valid votes, but those with indentations that are not separated from the ballot card do not).  Absent similar clear and certain standards, Florida's manual recount scheme cannot pass constitutional muster.

Moreover, Congress, to which the electors from Florida will be ultimately certified, has established a safe harbor, 3 U.S.C. § 5, that requires that such rules and standards be established *before* the election.  Because the 1989 Florida legislature has, in my view, abdicated its responsibility to formulate constitutionally clear and objective statutory rules and standards for the election process in Florida, it has disenfranchised voters throughout the state.[2]  The well-intended and responsible county canvassing boards across the state have been given, in legislative terms, an unfunded mandate --- discern the voter's intent without any objective statutory instructions to accomplish that laudable goal.  The effect of such an unguided, standardless, subjective evaluation of ballots to ascertain voter intent is to cause votes to be counted (or not to be counted) based only upon the disparate and unguided subjective opinion of a partisan (two members are elected in partisan voting) canvassing board.[3]  Since their opinions as to

---

[2] *See* Fl. Stat. Ann. § 102.166 (West 1989).  *See generally Roe v. Alabama*, 43 F.3d 574, 581-82 (11th Cir. 1995) (per curiam) (finding that the alteration of objective standards after the election disenfranchised voters).

[3] *See* Fl. Stat. Ann. § 102.141 (providing that the County Canvassing Board shall be comprised of a county court judge, chairman of the board of county commissioners and

voter intent are standardless no meaningful judicial review is possible by a Florida court. Accordingly, by finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made.[4]

It has been said that to err is human --- and humans vote. Thus, it should not be surprising that the voting process is subject to error. However, as demonstrated in the recent Presidential election, the frequency, magnitude and variety of error associated with the exercise of this sacred right of citizenship is at once astounding and deeply troubling. Morever, the media's focus on the campaign preceding November 7, having been eclipsed by its subsequent frenzy, has left the average citizen at the least skeptical, and at the worst cynical, about our democratic institutions. Morever, in its present

---

supervisor of elections; Fl. Stat. Ann. § 124.01(2) (providing for popular election of county commissioners); Fl. Const. Art. 8, Sec. 1(d) (providing for popular election of the supervisor of elections).

[4]We have indicated that the injury suffered by a plaintiff is "'irreparable' only if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987). To that end, we have presumed irreparable harm to a plaintiff when certain core rights are violated. See Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988) (irreparable harm presumed in Title VII cases); Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) (irreparable injury presumed from violation of First Amendment rights); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981) (irreparable injury presumed from violation of right to privacy under the Fourteenth Amendment); Northeastern Florida Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, Florida, 896 F.2d 1283, 1285-86 (11th Cir. 1990) (explaining that the basis for presuming irreparable injury in Cate and Deerfield was that given the "intangible nature" of the violations alleged, the plaintiffs could not effectively be compensated by an award of monetary damages). Cf. Richard Feiner & Co. v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996) (irreparable harm presumed when plaintiff establishes a prima facie case of copyright infringement).

incarnation, the post-election debacle that brings these cases to us for resolution may be cynically viewed by some as depicted by Congresswoman Shirley Chisholm:

> [P]olitics is a beautiful fraud that has been imposed on the people for years, whose practitioners exchange gilded promises for the most valuable thing their victims own: their votes. And who benefits the most? The lawyers.

Shirley Anita Chisholm, *Unbought and Unbossed*, 1970. To respond in that way would be a mistake.

While our nation's citizens have every right to be concerned, exasperated, fatigued and even cynical, it is my fervent hope that from these events they will come to understand, if not appreciate, the role of government's Third Branch in the life of our precious democracy. Our basic function in this society is to provide a forum in which disputes --- both great and small (although to those involved, a dispute is never "small") --- can be decided in an orderly, peaceful manner; and with a high level of confidence in the outcome. Lawyers, as officers of the court, are integral to that process in our adversarial system.

The right to vote --- particularly for the office of President of the United States, our Commander-In-Chief, --- is one of the most central of our fundamental rights in a democracy.[5]   Accordingly, any dispute that has at its core the legitimacy of a

---

[5] An executive like the President has broad discretion; he has the power to affect every voter, and thus every voter must be permitted to vote and to have his ballot both counted and

presidential election and impacts upon every citizen's right to vote, deserves the most

careful study, thought and wisdom that we can humanly bring to bear on the issues

entrusted to us.  Thus, I feel compelled to attest to the fact that my brother and sister

judges have embraced this case with a sense of duty, concern, and conscientious hard

work that is worthy of the issues before us.

Aware of the importance of these cases[6] and the urgency attendant to the issues

presented, we decided to take these disputes *en banc* --- that is, before the entire court

of twelve judges.[7]  Moreover, utilizing a procedure that we normally employ in death

---

equally weighed.  As the Supreme Court observed in *Anderson v. Celebrezze*, 460 U.S. 780, 794-95, 103 S. Ct. 1564, 1573 (1983) (citations omitted):

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest.  For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation.  Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.  Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders.  Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

[6]These cases have arrived at the appropriate juncture and present circumstances are of such an extraordinary scope that the "challenge to a state election rise[s] to the level of a constitutional deprivation."  *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).  *See Roe*, 43 F.3d at 580, 585.  The dissent in *Roe* opined that federal courts should not interject themselves into "state election disputes unless extraordinary circumstances affecting the integrity of the state's election process are clearly present in a high degree."  *Id.* at 585.  I am convinced, and surmise that the Supreme Court has concluded, that such a situation confronts us now.

[7]Fed.R.App.P. 35(a)(2).

penalty cases, we arranged through the clerks of the district courts involved to have copies of all filings there "lodged" (i.e., copies provided) with us contemporaneously.[8] Hence, we have been able to review and study the progress of the factual and legal matters presented in these cases from their inception.  Accordingly, long before the anticipated notices of appeal were filed, formally bringing them to us, we were about the study and review of the legal issues to be resolved.  Thus, the reader of our opinions[9] in this case should understand that our time for consideration has been considerably longer than it might appear at first blush.

Just as the electorate was divided in their good faith effort to cast their votes for our nation's chief executive, the members of this court have discharged their duty to interpret the law in the context of this case in an unbiased and sincere effort.  Inevitably the pundits will opine that a judge's decision is somehow linked  to the political affiliation of the President that appointed the judge.  While we at all levels of the judiciary have come to expect this observation we continue to regret that some "think" that is so.  It may be true that a judge's judicial philosophy may reflect, to some degree, the philosophy of the appointing President --- not a surprising circumstance --- but to

---

[8]11th Cir. R. 22-3.

[9]All of our opinions are available to the public on the Internet at www.ca11.uscourts.gov upon publication.

65

assume some sort of blind, mindless, knee-jerk response based on the politics of a

judge's appointer does us and the rule of law a grave injustice.  More importantly it is

just wrong.

I would hope that a careful and thoughtful review of the opinions of my brothers

and sisters would dispel any suggestion that their views on the important issues before

us are anything but the result of days of careful study and thoughtful analysis ---

because these opinions are nothing less.  We have done our duty.  I am proud to be

associated with my judicial colleagues that have been called upon to

discharge their respective constitutional obligations, albeit reluctantly --- both on this

court and the many other state and federal courts involved.  Indeed these recent events

have been a civics lesson for some --- particularly the young; but they have also been

a reminder that our nation's system of governance has weathered the test of time and

tumult; the old three-legged stool[10] still stands erect and with sufficient strength to

support the hopes and dreams of our nation's citizens.

The revered and quotable jurist, Learned Hand, once observed: "The spirit of

liberty is the spirit which is not too sure that it is right . . ."[11]  While not "right" about

_____

[10]The three branches of our government, the Legislative, the Executive, and the Judicial
("The Third Branch"), have often been compared to the familiar early American three-legged
stool.

[11]The corollary to that thought was expressed by the elder statesman from Florida,
Congressman Claude Pepper: "One has the right to be wrong in a democracy."  Cong. Rec. May

many things, I am confident that we have given these matters the attention they justly deserve and trust that, at least, we have laid the groundwork for an informed decision by the justices of the United States Supreme Court should they exercise their judgment to hear this case.  It is my hope that they do.  We have done our best so that they can do their best.

_____

27, 1946.

67

DUBINA, Circuit Judge, dissenting, in which TJOFLAT and BIRCH, Circuit Judges join:

I agree with the majority's disposition of the issues of abstention, res judicata, collateral estoppel, and mootness.  I also join and concur fully in the dissenting opinions filed by Judges Tjoflat, Birch, and Carnes.  I dissent from the disposition of the remaining issues discussed in the majority's opinion.  Specifically, I disagree with the notion that we cannot convert the preliminary injunction and reach the merits of this case.  *See Thornburgh v. American College of Obstetricians & Gynecologists*, 467 U.S. 747 (1986).

As to the merits of this case, the legal principles set forth in the cases of *Moore v. Ogilvie*, 394 U.S. 814 (1969), and *Roe v. Alabama*, 43 F.3d 574 (11th Cir. 1995), govern.  Based on these principles, I would reverse the judgment of the district court in this case.

CARNES, Circuit Judge dissenting, in which TJOFLAT, BIRCH and DUBINA, Circuit Judges, join:

For the reasons set out in my opinion in <u>Siegel v. Lepore</u>, No. 00-15981, I dissent.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By: _Lisa Frieter_
Deputy Clerk
Atlanta, Georgia